UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **JIN O. JIN**, <br><br> Plaintiff, <br><br> v. <br><br> **PARSONS CORPORATION**, <br><br> Defendant. | Case No. 1:18-cv-02222 (TNM) |

## **MEMORANDUM ORDER**

Plaintiff Jin O. Jin worked for Defendant Parsons Corporation for over twenty years. Parsons fired him in 2018, and he sued, alleging discrimination and retaliation in violation of the Age Discrimination in Employment Act. Parsons has moved to stay proceedings and compel arbitration. According to Parsons, Mr. Jin assented to an arbitration agreement by remaining at Parsons after being told that continued employment constituted acceptance of the agreement. Under D.C. contract law, however, an agreement is enforceable only if both parties "have the distinct intention to be bound." *Jack Baker, Inc. v. Office Space Dev. Corp.,* 664 A.2d 1236, 1239 (D.C. 1995) (quoting *Edmund J. Flynn Co. v. LaVay*, 431 A.2d 543, 547 (D.C. 1981)). There is a genuine dispute over whether Mr. Jin had such an intention. So Parsons' Motion to Stay Proceedings and Compel Arbitration will be denied.

**I.**

Given the stage of the proceedings, the Court recites the facts in the light most favorable to the plaintiff, Mr. Jin. *See Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008) (applying summary judgment standard to motion to compel arbitration). Mr. Jin worked for Parsons from September 1996 to June 2018. Compl. at 3, ECF No. 1. In 2016,

Parsons reduced Mr. Jin to part-time status and put him on a "Performance Improvement Plan" based on allegations of performance deficiencies. *Id.* at 2. Mr. Jin complained to Parsons that these decisions were based on his age. *Id.* Eventually, in 2018, Parsons fired him. *Id.* Alleging age discrimination and retaliation, Mr. Jin sought relief from the EEOC. *Id.* at 3. After the EEOC issued its right-to-sue letter, he filed his lawsuit here, seeking relief under the Age Discrimination in Employment Act. *Id.* at 14–16.[1]

Parsons filed this motion to stay proceedings and compel arbitration. Def.'s Mem. ISO Mot. to Stay ("Def.'s Mem.") at 1, ECF 9-1. According to Parsons, it instituted an Employee Dispute Resolution program in 1998, which included an Agreement to Arbitrate ("Agreement"). *Id.* In the fall of 2012, Parsons updated the program and the Agreement. Miller Decl. ¶ 5, ECF No. 9-2. In October 2012, Parsons emailed its employees telling them about the updates and asking them to complete a certification acknowledging receipt of the Agreement. Def.'s Mem. at 2. Parson advised employees that "[i]f you do not sign the Agreement to Arbitrate, your continued employment with Parsons after the Effective Date will constitute your acceptance of the Agreement to Arbitrate." "Reminder – EDR/Agreement to Arbitrate" Email at 39, ECF No. 9-2. According to Parsons' email-tracking records, it sent Mr. Jin this initial email and then three reminders over the next month. Miller Decl. ¶ 7. But despite these emails, he never acknowledged the Agreement. Still, Parsons argues that Mr. Jin implicitly agreed to arbitrate by continuing to work for Parsons after receiving this notice. Def.'s Mem. at 2.

In response, Mr. Jin vehemently insists that he never agreed to arbitrate his disputes with Parsons. Pl. Opp. to Def.'s Mot. ("Pl. Opp.") at 1. In an affidavit, he stated that he did not

---

[1] The Court has federal question jurisdiction under 28 U.S.C. § 1331 because Mr. Jin sued under a federal statute.

recall Parsons implementing an Employee Dispute Resolution program, receiving emails about the Agreement, or reviewing the Agreement. Jin Decl. at 1, ECF No. 11-1.

## II.

Courts examine motions to compel arbitration under the summary judgment standard of Federal Rule of Civil Procedure 56(c). *Aliron Intern., Inc. v. Cherokee Nation Indus., Inc.*, 531 F.3d 863, 865 (D.C. Cir. 2008). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking to compel arbitration must come forward with evidence to establish an enforceable agreement to arbitrate. *Hill v. Wackenhut Servs. Int'l*, 865 F. Supp. 2d 84, 89 (D.D.C. 2012).

The Federal Arbitration Act provides that certain arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Given the Act's presumption favoring enforcement of arbitration claims, courts must "rigorously enforce arbitration agreements according to their terms." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 221 (1985)).

But there is a catch. The Act applies only if there is an enforceable contract. *See Camara v. Mastro's Rests. LLC*, 340 F. Supp. 3d 46, 51 (D.D.C. 2018). In determining whether an arbitration agreement is a valid contract, a court must "apply ordinary state law principles that govern the formation of contracts." *Hughes v. CACI, Inc.*, 384 F. Supp. 2d 89, 95 (D.D.C. 2002).

# III.

"For an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Georgetown Entm't Corp. v. District of Columbia,* 496 A.2d 587, 590 (D.C. 1985). D.C. law requires that both parties "have the distinct intention to be bound; without such intent, there can be no assent and therefore no contract." *Jack Baker*, 664 A.2d at 1239 (quoting *Edmund J. Flynn Co.*, 431 A.2d at 547). The central issue thus boils down to whether Mr. Jin intended to accept the Agreement.[2] This is a question of D.C. contract law, not arbitrability.

It is undisputed that Mr. Jin never signed the Agreement. But according to Parsons, Mr. Jin showed his intent to be bound to the Agreement when he continued to work for Parsons after receiving repeated notice that continued employment would constitute assent. Def.'s Mem. at 1.

As Parsons points out, "although 'mutual assent to a contract is most clearly evidenced by the terms of a signed written agreement, such a signed writing is not essential to the formation of a contract.'" *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1301 (D.C. Cir. 2002) (quoting *Davis v. Winfield*, 664 A.2d 836, 837 (D.C. 1995)). Even though the lack of a signature is not dispositive, Parsons must still prove that Mr. Jin intended to accept the Agreement.

In *Bailey v. Federal National Mortgage Association,* the D.C. Circuit held that under D.C. contract law continued employment did not demonstrate an intent to be bound by an arbitration policy. 209 F.3d 740, 746–47 (D.C. Cir. 2000). There, the employer sought to compel arbitration under a "Dispute Resolution Policy" unilaterally promulgated by the employer after the plaintiff was hired. *Id.* at 741. The issue was not whether the employee

---

[2] Mr. Jin does not assert that the procedures outlined in the Agreement would keep him from vindicating his statutory rights or dispute that the Agreement covers his ADEA claims. Pl. Opp. at 1 n.1.

rejected the arbitration policy but whether he did "something to indicate that he intended to enter into an agreement with [the employer] so as to bind himself to pursue his statutory claims of employment discrimination in arbitration." *Id.* at 746. *Bailey* rejected the employer's argument that when the plaintiff "*continued* in his job with the employer, this showed that he acceded the Dispute Resolution Policy, because the Policy itself was proclaimed to be a 'condition of employment.'" *Id.* at 746.

Parsons argues that "*Bailey* is not a blanket prohibition on conduct manifesting assent to an employer's arbitration agreement." Def.'s Mem. at 10. Fair enough. But *Bailey* requires the Court to "closely" examine whether Mr. Jin intended to accept the Agreement promulgated by Parsons. *Bailey*, 209 F.3d at 746 (quoting *Jack Baker*, 664 A.2d at 1239).[3] Like the employee in *Bailey*, Mr. Jin "did nothing whatsoever to embrace" the Agreement. *Id.* And his continued employment alone does not show that he assented to the Agreement. *See id.* at 746–47; *accord The George Town Club at Suter's Tavern v. Salamanca,* No. 06-cv-2181, 2007 WL 1041657, at *4 (D.D.C. Apr. 5, 2007) (denying a motion to compel arbitration when an employee continued working after receiving—but never signing—a document with an arbitration policy).

According to Parsons, *Bailey* is "problematic precedent" after *Epic Systems Corporation v. Lewis*, 138 S. Ct. 1612 (2018). Not so. First, even though there is a "liberal federal policy favoring arbitration agreements," *Epic Sys.*, 138 S. Ct. at 1621 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)), the primary issue here is one of local

---

[3] As Parson points out, other circuits have concluded that continued employment suffices to show assent if the agreement states that continued employment constitutes acceptance of the arbitration policy. These cases, however, are of limited value because they do not interpret D.C. contract law. *See, e.g.*, *Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013) (interpreting Michigan law); *Berkley v. Dillard's Inc.*, 450 F.3d 775, 777 (8th Cir. 2006) (interpreting Missouri law); *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 478 (10th Cir. 2006) (interpreting Oklahoma law).

contract law, namely, what constitutes mutual assent under D.C. law. Moreover, in *Epic Systems*, the Supreme Court "took as a given that the plaintiffs had agreed to pursue their claims in arbitration." *Camara*, 340 F. Supp. 3d at 54. Mutuality of assent was not even before the Court.

True, this case has important factual differences from *Bailey*. Parsons sent Mr. Jin several emails, explaining that Parsons had revised its Employee Dispute Resolution program, requesting that he sign the Agreement, and telling him that his "continued employment with Parsons" *would* count as acceptance of the Agreement. *See* Def.'s Mem. at 8. Parsons argues that these communications are evidence that his continued employment does reveal an intent to be bound: Mr. Jin knew (or should have known) that if he kept working at Parsons, he would have to arbitrate his disputes with Parsons. *Id.*

But Parsons' evidence cuts both ways. Under Parsons' own version of the facts, Mr. Jin never signed the Agreement even after receiving four emails requesting him to do so. Considering the facts in the light most favorable to Mr. Jin, this is evidence that he did *not* intend to be bound. Sure, he could have voiced his disagreement, but by the same token, he repeatedly refused to show his acceptance of the Agreement. As discussed, Parsons has the burden of proving that Mr. Jin intended to accept the Agreement. Parsons could have required him to sign the Agreement at the risk of termination or confronted him in person about the Agreement, but Parsons chose not to do so.

Parsons cites *Davis v. Winfield*, 664 A.2d 836 (D.C. 1995), to show that conduct of the parties can establish mutual assent to a contract. Def.'s Mem. at 7–8. In that case, the trial court had not admitted a lease into evidence because it was not signed by the landlord. 664 A.2d at 838. The D.C. Court of Appeals explained that this was "not determinative of the validity or

existence of the contract" and remanded for a new trial to determine, among other things, whether there was a legally binding agreement, despite the lack of the landlord's signature. *Id.*

But this case does not save Parsons. In *Davis*, the landlord had accepted the renters' partial performance, removed the house from the market, prepared to turn over the keys, and initialed various handwritten changes to the lease. *Id.* By contrast, Parsons points to no change in Mr. Jin's behavior that would signify acceptance. While the *Davis* landlord's specific actions make sense only if she intended to form a contract with the renters, Mr. Jin's continued employment accords with his alleged ignorance that such an Agreement even existed.

The facts presented by Parsons are ambiguous. It is possible that Mr. Jin read the emails about the Agreement, but perhaps he did not. And if he did not know about the Agreement, there was no meeting of the minds no matter what the Agreement says. *See Bailey*, 209 F.3d at 746 ("[U]nder District law, an enforceable contract does not exist unless there has been a 'meeting of the minds' as to all material terms."). There is also a third plausible scenario: that Mr. Jin read the emails and did not want to accept the Agreement but was reluctant to voice his disagreement to his employer. Mr. Jin may have continued working at Parsons with no intention of arbitrating his disputes with Parsons. All three scenarios are compatible with the fact that he never replied to the arbitration emails.

Mr. Jin submitted a sworn declaration denying that he "intend[ed] to be bound by the Agreement to Arbitrate." Jin Decl. at 1. He attested that he did not recall receiving the emails produced by Parsons, and he never reviewed the Agreement. *Id.* Even though a self-serving affidavit on its own will not ordinarily create a fact issue, *see Carter v. George Wash. Univ.*, 180 F. Supp. 2d 97, 111 (D.D.C. 2001), *aff'd*, 387 F.3d 872 (D.C. Cir. 2004), Mr. Jin's affidavit is, at least, not inconsistent with the established facts here. Everyone agrees that Mr. Jin did not

acknowledge the Agreement, and his affidavit gives one explanation: because he did not know about it. True, a jury may not believe Mr. Jin, given the email documentation and business records presented by Parsons. A jury may credit Parsons' evidence and discredit Mr. Jin's sworn declaration, but for now there is a genuine factual dispute. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) (explaining that a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party).

Parsons insists that Mr. Jin cannot defeat the mailbox rule—the presumption that a letter (or email) was delivered to its intended recipient—by claiming that he did not receive four emails. Def.'s Reply Mem. ISO Mot. ("Def.'s Reply") at 3, ECF No. 12. Parsons argues that "a mere denial of receipt is insufficient to rebut the presumption accorded the sender under the mailbox rule." Def.'s Reply at 4 (quoting *Lepre v. Dep't of Labor*, 275 F.3d 59, 70 (D.C. Cir. 2001)).

This argument misses the mark. The real issue is not whether Mr. Jin *received* the emails but whether he *read* them. If Mr. Jin did not know about the Agreement, it is impossible that he intended to be bound by it. By contrast, in *Lepre*, the issue was whether the plaintiff, who was bringing a due process challenge, had notice before the suspension of his benefits. *Lepre*, 275 F.3d at 70. Unfortunately for Parsons, proving Mr. Jin's intention to be bound is harder than proving mere constructive notice. Parsons' mailbox rule argument is unpersuasive.

Parsons also insists that Mr. Jin's decision not to read the Agreement does not relieve him from the Agreement's terms, citing *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 101 (D.D.C. 2004). Reply at 5. But had Parsons read the next three words beyond the quote it offered to this Court, it would have seen the glaring difference between that case and this one. The party objecting to the arbitration agreements in *Booker* had already *signed* the agreement.

8

*Booker*, 315 F. Supp. 2d at 101. And under D.C. law, "a signature on a contract indicates 'mutuality of assent' and a party is bound by the contract unless he or she can show special circumstances relieving him or her of such an obligation.'" *Emeronye v. CACI Int'l, Inc.*, 141 F. Supp. 2d 82, 86 (D.D.C. 2001). Here, there is no signature, and the other evidence of mutuality of assent is ambiguous, at best. Thus, Parsons has not met its burden.

## IV.

For these reasons, it is hereby

**ORDERED** that Defendant's Motion to Stay Proceedings and Compel Arbitration is DENIED.

Dated: January 29, 2019                                TREVOR N. McFADDEN, U.S.D.J.